ORIGINAL

FILED

IN THE UNITED STATES COURT OF FEDERAL CLAIMS FEB 2 6 2014

U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| **Bruce Reid** and **Bryndon Fisher**, derivatively on behalf of **Federal Home Loan Mortgage Corporation**,<br><br>     Plaintiffs,<br><br> v.<br><br>**The United States of America**,<br><br>     Defendant,<br><br>and **Federal Home Loan Mortgage Corporation**<br><br>     Nominal Defendant. | No. 14- 152C |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Upon personal knowledge as to their own acts and status, and based upon their investigation, their counsel's investigation, and information and belief as to all other matters, Plaintiffs Bruce Reid and Bryndon Fisher ("Plaintiffs"), derivatively on behalf of the Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company"), allege as follows:

### SUMMARY OF THE ACTION

1.  This is a shareholder derivative action on behalf of Freddie Mac against The United States of America ("United States" or the "Government") and nominal defendant Freddie Mac. This derivative action seeks just compensation for the taking of the private property of Freddie Mac for public use by the United States, including the

Department of the Treasury ("Treasury"), the Federal Housing Finance Agency ("FHFA"), and their respective agents.

2.    In 2012, the Government imposed a "Net Worth Sweep" on Freddie Mac, which required the Company to pay its entire net worth to the U.S. Treasury every quarter in perpetuity. The Government's taking of the entire net worth of Freddie Mac effectively destroyed all value in the Company and amounts to a blatant overreach by the Government in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution.

3.    Freddie Mac is a private corporation charged with maintaining a stable and liquid secondary mortgage market by purchasing mortgage loans from other financial institutions, issuing and purchasing mortgage-backed securities, and guaranteeing privately-owned mortgage-backed securities.

4.    During the mortgage-related financial crisis that began in 2007, Congress created the FHFA, a federal administrative agency designed to oversee the operations of Freddie Mac, and empowered it to serve as Conservator of the Company when necessary to preserve its financial health. When exercising its statutory powers as Conservator, the FHFA is obligated to manage the Company with the goal of putting it in a sound and solvent financial condition while preserving and conserving its assets.

5.    Congress also authorized Treasury to provide financial assistance to Freddie Mac. Treasury was authorized to provide this assistance by purchasing securities issued by the Company if it determined that such purchases would help stabilize financial markets, prevent disruptions in the mortgage markets, and protect taxpayers.

6.      On September 7, 2008, the Director of the FHFA, who is nominated by the President and confirmed by the U.S. Senate, placed Freddie Mac into conservatorship, committing to "operate the [Company] until [it is] stabilized."[1] This suit does not challenge the legality of the FHFA's initial placement of Freddie Mac into conservatorship or claim that action was a taking—but rather challenges the Government's subsequent amendment to the terms of the conservatorship through the imposition of the "Net Worth Sweep" in 2012.

7.      In conjunction with the conservatorship in 2008, Treasury and the FHFA executed a Preferred Stock Purchase Agreement ("PSPA"). Under the PSPA, Treasury purchased one million shares of Government Preferred Stock from Freddie Mac in exchange for a funding commitment that allowed the Company to draw up to $100 billion from Treasury as needed to ensure it maintained a positive net worth. The Government Preferred Stock has a liquidation preference equal to $1 billion plus the sum of all draws by the Company against Treasury's funding commitment (the "Liquidation Preference"). The Government was entitled to a cumulative annual dividend equal to 10% of the outstanding Liquidation Preference. The PSPA also grants Treasury warrants to purchase up to 79.9% of the Company's common stock at a nominal price.

8.      Shortly after the FHFA imposed the conservatorship, Freddie Mac declared large non-cash losses, largely due to the write-down of substantial deferred tax assets on its balance sheet and taking large loss reserves. These accounting adjustments, which reflected an overly pessimistic view of the value of the mortgages owned by

---

[1] Press Release, FHFA, Statement of FHFA Director James B. Lockhart, at 6 (Sept. 7, 2008), available at http://www.fhfa.gov/webfiles/23/FHFAStatement9708final.pdf.

Freddie Mac, depleted the Company's operating capital. As a result, the Government advanced over seventy billion dollars pursuant to the PSPA to shore up the Company's balance sheet. These actions, in turn, substantially increased the annual dividends due to the Government.

9.      By 2012, with the housing market on a recovery path, Freddie Mac was again profitable. The Company's actual realized loan losses were tens of billions of dollars less than had been expected. As a result, the Company reversed many of its earlier write-downs of deferred tax assets and mortgages. Beginning in 2012, the Company posted multi-billion dollar profits and has been consistently profitable since that time.

10.     By the end of the second quarter of 2012, Freddie Mac was so profitable that it had sufficient money to pay all the dividends that it owed the Government pursuant to the PSPA. With consistently large profits expected, the Company was positioned to redeem all the Government Preferred Stock pursuant to the terms of the pre-Third Amendment PSPA by paying the entire Liquidation Preference and all accrued dividends. This redemption would have permitted the Company to continue as a financially solvent, viable, and valuable entity.

11.     The Government did not allow this to happen. Instead, the Government acted unilaterally to amend the terms of the PSPA and expropriate all remaining profits and value in the Company for its own public use, without providing just compensation to the Company. Two government agencies, the FHFA and Treasury, conspired to effectively dismantle Freddie Mac as a profitable company, and in the process, swept

every last penny of value from the Company. This action constituted an unlawful taking in violation of the Fifth Amendment to the U.S. Constitution.

12.    On August 17, 2012, the FHFA and Treasury executed the Third Amendment to the Amended & Restated Senior Preferred Stock Purchase Agreement (the "Third Amendment"). Under the Third Amendment, which went into effect on January 1, 2013, the Government required Freddie Mac to pay Treasury the Company's entire net worth (the "Net Worth Sweep") each fiscal quarter. Under the Net Worth Sweep, the Government took the entirety of the Company's value in perpetuity. Instead of the Government requiring that Freddie Mac pay a quarterly dividend equal to an annual rate of ten percent of the Government Preferred Stock's Liquidation Preference, the Third Amendment required Freddie Mac to pay every dollar of its net worth, less a small, temporary capital reserve, to the Government, irrespective of the the outstanding Liquidation Preference.[2] Under the terms of the Third Amendment, payments made by the Company to Treasury pursuant to the Net Worth Sweep, no matter how large, do not reduce the Government's outstanding Liquidation Preference. Accordingly, the Third Amendment completely deprived Freddie Mac of all economic value.

13.    By unilaterally imposing the Net Worth Sweep, the Government has reaped—and will continue to reap—an enormous windfall for the U.S. Treasury. In March 2013, Freddie Mac paid Treasury its first quarterly dividend under the Net Worth Sweep: $5.8 billion. Freddie Mac subsequently made quarterly dividend payments to Treasury of $7.0 billion in June 2013, $4.4 billion in September 2013, and $30.4 billion in December 2013. Since the imposition of the Net Worth Sweep, Freddie Mac has paid

---

[2] The specified capital reserve steadily declines to zero in 2018.

the Government $47.6 billion in dividends, while under the pre-Third Amendment

PSPA, the Company would have been obligated to pay only $7.2 billion during that

period. By the terms of the Third Amendment, the additional $40.4 billion that Freddie

Mac paid to Treasury does not reduce the Liquidation Preference at all. Absent the Third

Amendment, Freddie Mac would have been able to use its substantial profits in 2013 to

dramatically reduce its obligations to the Government. But the Third Amendment

forbids it from doing so.

14.     Under the Third Amendment, the amounts Freddie Mac paid the

Government in dividends do not—and will not ever—reduce the outstanding Liquidation

Preference of the Government Preferred Stock or reduce the amount of such stock

outstanding. As a result, the total Liquidation Preference remains $72.3 billion, even

though the Company has paid an additional $47.6 billion in dividends under the Net

Worth Sweep. Absent the Third Amendment, Freddie Mac would now be on track to

completely pay off its Government draws during early 2014.

15.     Instead, because the Third Amendment now requires that the

Government's dividend payments be equal to the total net worth of the entire Company,

it will *never* be possible for Freddie Mac to reduce, much less eliminate, the Liquidation

Preference. The Government will continue to take the Company's entire net worth for as

long as it remains in business. And it will *never* be possible for Freddie Mac to escape

conservatorship.

16.     As the Government itself has acknowledged, the Government's actions are

designed to benefit taxpayers at the expense of the Company. Far from hiding its motive,

the Government's stated goal of the Net Worth Sweep is to take "every dollar of earnings [Freddie Mac] generates … to benefit taxpayers."[3]

17.    However, under the Fifth Amendment to the U.S. Constitution, the Government cannot simply expropriate private property, let alone take the entire net worth of a legal, private company, without the payment of just compensation. And the Government cannot enrich itself through a self-dealing pact among Government agencies to take the entire value of Freddie Mac for public use by taxpayers.

18.    The Third Amendment was not the result of an arm's length agreement. To the contrary, the Government amended its own Government Preferred Stock Agreement by way of an "agreement" between two agencies of the federal government: Treasury and the FHFA. In essence, the Government agreed with itself to expropriate the private property of Freddie Mac for the use of the Government.

19.    In executing the Third Amendment, the FHFA and Treasury openly acknowledged that a primary purpose was to "expedite the wind down of Freddie Mac" as a going concern.[4] As Treasury explained, as a result of the Net Worth Sweep, Freddie Mac "will be wound down and will not be allowed to retain profits, rebuild capital, [or] return to the market in [its] prior form." Since the purpose  of the Third Amendment falls outside the scope of the FHFA's statutory authority when acting as Conservator to

---

[3] Press Release, Treasury, *Treasury Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie Mac* (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx; *see also Statement of FHFA Acting Director Edward J. DeMarco On Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements* (Aug. 17, 2012), *available at* http://www.fhfa.gov/webfiles/24203/final_fhfa_pspa_8172012.pdf ("Replacing the current fixed dividend in the PSPAs with a variable dividend based on net worth will … fully capture financial benefits for taxpayers").

[4] *Id*; *see also* FHFA Office of Inspector General, *Analysis of the 2012 Amendments to the Government Stock Purchase Agreements*, at 18-19 (Mar. 20, 2013) (characterizing the goals of the Third Amendment as "benefit to taxpayers" and "wind down of [Freddie Mac]").

Freddie Mac, the FHFA was not acting as Conservator when it signed the Third Amendment. Instead, the FHFA was acting as a Government agent when it signed the Third Amendment, and its and Treasury's actions amounted to a taking of private property for public, not private use.

20.     While it is debatable whether the Net Worth Sweep constitutes sound economic policy, one fact is unmistakable: the result of the Government's actions is a total taking of all economic value of Freddie Mac. Under the Fifth Amendment to the U.S. Constitution, Freddie Mac is owed just compensation.

### JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1491(a).

22.     Pursuant to Rule of the Court of Federal Claims 23.1(b)(2), this is not a collusive action to confer jurisdiction that this Court would otherwise lack.

### PARTIES

23.     Plaintiff Bruce Reid ("Reid") is a citizen of California. Reid currently owns and, at all relevant times, has owned 28,000 shares of nominal defendant Freddie Mac's common stock. In addition, Reid jointly owns and, at all relevant times, has owned 5,000 shares of Freddie Mac's junior preferred stock with his husband, plaintiff Bryndon Fisher. Reid has owned Freddie Mac common and junior preferred stock prior to, at the time of, and continuously since the Government imposed the Third Amendment on August 17, 2012.

24.     Plaintiff Bryndon Fisher ("Fisher") is a citizen of California. Fisher jointly owns and, at all relevant times, has owned 5,000 shares of nominal defendant Freddie Mac's junior preferred stock with Reid. Fisher has owned Freddie Mac junior preferred stock prior to, at the time of, and continuously since the Government imposed the Third Amendment on August 17, 2012.

25.     Defendant United States of America includes the U.S. Department of Treasury and agents acting at the direction of Treasury. Defendant United States also includes the Federal Housing Finance Agency and agents acting at the direction of the FHFA when the FHFA acts outside the scope of its statutory authority as Conservator to Freddie Mac under the Housing and Economic Recovery Act of 2008 ("HERA").

26.     Nominal Defendant Federal Home Loan Mortgage Association is a federally chartered, government-sponsored enterprise that supplies capital and liquidity for residential mortgages. Freddie Mac is a publicly traded private corporation, has a Board of Directors ("Board"), and is required to report to the Securities and Exchange Commission ("SEC"). Freddie Mac's by-laws expressly provide that the law of the Commonwealth of Virginia, including the Virginia Stock Corporation Act, applies to the conduct of the Company

## NON-DEFENDANT DIRECTORS

27.     Carolyn H. Byrd ("Byrd") has served as a member of the Board of Directors of Freddie Mac since December 2008. On February 26, 2013, the Conservator executed a written consent reelecting Byrd as a member of the Board.

28.     Richard C. Hartnack ("Hartnack") has served as a member of the Board of Directors of Freddie Mac since May 2013, when he was elected by the Conservator.

29.     Steven W. Kohlhagen ("Kohlhagen") has served as a member of the Board of Directors of Freddie Mac since February 2013. On February 26, 2013, the Conservator executed a written consent reelecting Kohlhagen as a member of the Board.

30.     Donald H. Layton ("Layton") has served as a member of the Board of Directors of Freddie Mac since May 2012. On February 26, 2013, the Conservator executed a written consent reelecting Layton as a member of the Board.

31.     Christopher S. Lynch ("Lynch") has served as a member of the Board of Directors of Freddie Mac since December 2008. Lynch has served as Non-Executive Chairman of Freddie Mac since December 2011. On February 26, 2013, the Conservator executed a written consent reelecting Lynch as a member of the Board.

32.     Sara Mathew ("Mathew") has served as a member of the Board of Directors of Freddie Mac since December 2013, when she was elected by the Conservator.

33.     Saiyid T. Naqvi ("Naqvi") has served as a member of the Board of Directors of Freddie Mac since August 2013, when he was elected by the Conservator.

34.     Nicolas P. Retsinas ("Retsinas") has served as a member of the Board of Directors of Freddie Mac since June 2007. On February 26, 2013, the Conservator executed a written consent reelecting Retsinas as a member of the Board.

35.     Eugene B. Shanks, Jr. ("Shanks") has served as a member of the Board of Directors of Freddie Mac since December 2008. On February 26, 2013, the Conservator executed a written consent reelecting Shanks as a member of the Board.

36.     Anthony A. Williams ("Williams") has served as a member of the Board of Directors of Freddie Mac since December 2008. On February 26, 2013, the Conservator executed a written consent reelecting Williams as a member of the Board.

37.     The directors of Freddie Mac are not named as defendants because, as explained *infra*, the FHFA has effectively assumed all of the powers of the directors. The directors, therefore, are not indispensable parties to this action.

## CONSTITUTIONAL PROVISION

38.     Plaintiffs' claim is governed by the Fifth Amendment to the United States Constitution, which provides in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

## FACTUAL ALLEGATIONS
### History of Freddie Mac and Relevant Statutes

39.     Freddie Mac was created by federal statute in 1970. As part of the Emergency Home Finance Act of 1970, Congress authorized Freddie Mac to participate in the secondary market for home mortgages. Congress wanted to provide competition in the secondary market for mortgages in the United States, which, prior to 1970, had been monopolized by another federally chartered entity, the Federal National Mortgage Association ("Fannie Mae").

40.     Freddie Mac participates in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities. The secondary mortgage market consists of

institutions engaged in buying and selling mortgages in the form of whole loans and mortgage-related securities. Freddie Mac does not lend money directly to homeowners.

41.     At its creation in 1970, Freddie Mac was owned by the Federal Home Loan Bank Board ("FHLBB"), an independent agency that regulated and promoted the savings and loans industry. Freddie Mac was originally only authorized to purchase mortgages from members of the FHLBB. In 1978, Freddie Mac's authority was expanded to allow it to purchase mortgages directly from mortgage-banking firms.

42.     In 1989, Congress privatized Freddie Mac. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") altered Freddie Mac's corporate structure and relationship to the Government, privatizing the management and operations of the Company and vesting its ownership in private stockholders.

43.     Together with its sister entities, Fannie Mae and Ginnie Mae, these private companies are commonly referred to as Government Sponsored Enterprises ("GSEs"), reflecting the fact that they are private corporations created by Congress with the goal of increasing liquidity in the mortgage market. Today, Freddie Mac endeavors to achieve this goal by purchasing mortgages originated by private banks and bundling these mortgages into mortgage-related securities that can be sold to investors. By creating this secondary mortgage market, Freddie Mac increases liquidity for private banks, allowing them to make additional loans to individuals to purchase homes.

44.     Since 1989, Freddie Mac has been a privately-owned corporation. The Company has obtained funding from private capital, including common and preferred

stock, which have publicly traded on the New York Stock Exchange ("NYSE").[5] Prior to September 6, 2008, Freddie Mac regularly paid dividends on its common and preferred stock. And before 2007, the Company was consistently profitable. In fact, from the time it was privatized until 2006, Freddie Mac never reported a full-year loss.

45.    In 1992, Congress enacted the Federal Enterprises Financial Safety and Soundness Act (the "Safety and Soundness Act"). The Safety and Soundness Act created the Office of Federal Housing Enterprise Oversight ("OFHEO") as the new regulator for Freddie Mac, imposed minimum capital requirements on the Company, and provided OFHEO with the authority to impose a conservatorship in the event that Freddie Mac became critically undercapitalized.

46.    In 2007, the nation's mortgage market began a precipitous decline as part of the global financial crisis, and an increasing number of mortgages fell into delinquency and default. Consequently, the markets lost confidence in the financial health of Freddie Mac. Government officials attempted to allay these concerns and shore up confidence in the GSEs. James B. Lockhart, then-Director of OFHEO, confirmed that Freddie Mac was "adequately capitalized, holding capital well in excess of [regulatory requirements]" and had a "large liquidity portfolio[], access to the debt market and over $1.5 trillion in unpledged assets."[6]

47.    Nevertheless, given the critical importance of the housing market to the broader U.S. economy and the need to instill confidence in the market, Congress

---

[5] On June 16, 2010, Freddie Mac announced that, at the direction of the FHFA, its stock would be delisted from the NYSE. On July 7, 2010, Freddie Mac stock ceased trading on the NYSE, and on the following day, July 8, 2010, the Company began trading on the OTC Bulletin Board under the symbol FMCC. Freddie Mac stock continues to be publicly traded on the OTC Bulletin Board.

[6] Lockhart would later become Director of the FHFA.

enacted HERA. HERA created the FHFA as the successor to OFHEO and provided the

FHFA with expanded regulatory powers. HERA further defined the FHFA's powers to

place Freddie Mac into conservatorship and authorized Freddie Mac to be placed into

receivership under certain statutorily-defined circumstances.

## FHFA Places Freddie Mac in Conservatorship

48.    On September 7, 2008, FHFA Director Lockhart announced that the

FHFA had placed Freddie Mac in conservatorship.[7] Lockhart described conservatorship

as "a statutory process designed to stabilize a troubled institution with the objective of

returning [Freddie Mac] to normal business operations." The FHFA pledged to act as

the Company's Conservator until the Company was stabilized.

49.    Under HERA, the FHFA's powers as Conservator are limited to only those

"necessary to put the [Company] in a sound and solvent condition" and those that

"preserve and conserve the assets and property of the [Company]." 12 U.S.C. § 4617(b)

(2)(D). Furthermore, the FHFA, acting in its capacity as Conservator to Freddie Mac,

may "perform all functions of the [Company] in the name of the [Company]" only to the

extent they are "consistent with [its] appointment as conservator." 12 U.S.C. § 4617(b)

(2)(B)(iii).

50.    Lockhart announced that "in order to conserve over $2 billion in capital

every year, the common and preferred stock dividends will be eliminated, but the

common and all preferred stock will continue to remain outstanding. Subordinated debt

interest and principal payments will continue to be made." However, the

---

[7] The actual imposition of the conservatorship occurred on September 6, 2008.

conservatorship did not expropriate any of the outstanding preferred or common stock in the Company, and the terms of the Company's stock were not formally modified.

51.     Lockhart's announcement envisioned that the Company would eventually be returned to profitability, and the conservatorship would be lifted. He made clear that the conservatorship would be run with an eye toward attracting additional private investment to the Company, noting that "some of the key regulations will be minimum capital standards, prudential safety and soundness standards and portfolio limits." According to Lockhart, the purpose of the new regulations was "so that any new investor will understand the investment proposition."

52.     However, in private, Treasury never intended to allow the Company to return to private ownership or control. According to a December 20, 2010 Treasury memo, the Government was committed to "ensur[ing] that common equity holders [did] not have access to any positive earnings from [Freddie Mac] in the future."[8]

53.     HERA also authorized Treasury to strengthen Freddie Mac's balance sheet by purchasing its securities within set time limits and consistent with certain statutory requirements. Congress authorized Treasury to "purchase any obligations and other securities issued by the [Company] ... on such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine" during the time period from HERA's enactment in 2008 through December 31, 2009. 12 U.S.C. §§ 1455(l)(1)(A), 1719(g)(1)(A). Before exercising that authority, HERA required the Treasury Secretary to determine that purchasing Freddie Mac's securities was

---

[8] *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*, No. 13-mc-1288-RCL (D.D.C.), Administrative Record of the Department of the Treasury, Doc. No. 6-5, at T0202 (Periodic Commitment Fee for GSE Preferred Stock Purchase Agreements (PSPAs) (Dec. 20, 2010)).

"necessary to ... provide stability to the financial markets; prevent disruptions in the availability of mortgage finance; and protect the taxpayer." 12 U.S.C. §§ 1455(l)(1)(B), 1719(g)(1)(B).

54.     Pursuant to this temporary authority, Treasury entered into the PSPA with the Company under which the Government would receive a newly issued series of preferred stock that was senior in priority to all other Freddie Mac stock ("Government Preferred Stock"). Treasury Secretary Henry Paulson ("Paulson") announced, "With this agreement, Treasury receives senior preferred equity shares and warrants that protect taxpayers. Additionally, under the terms of the agreement, common and preferred shareholders bear losses ahead of the new government preferred shares."

55.     In exchange, Freddie Mac was permitted to draw up to $100 billion from Treasury.[9] The Government Preferred Stock had a Liquidation Preference equal to $1 billion plus the sum of all draws by the Company against Treasury's funding commitment and is entitled to a cumulative annual dividend equal to ten percent of the outstanding Liquidation Preference. The PSPA also grants Treasury warrants to purchase up to 79.9% of the Company's common stock at a nominal price.

56.     According to a Treasury fact sheet, the agreement "provides significant protections for the taxpayer, in the form of senior preferred stock with a liquidation preference, an upfront $1 billion issuance of senior preferred stock with a 10% coupon from [Freddie Mac], quarterly dividend payments, warrants representing an ownership stake of 79.9% of [Freddie Mac] going forward, and a quarterly fee starting in 2010."

---

[9] In the First Amendment to the PSPA, Treasury and the FHFA agreed to expand this funding commitment to $200 billion in May 2009. In the Second Amendment to the PSPA, on December 24, 2009, Treasury and the FHFA agreed to a funding commitment that would be sufficient to enable the Company to satisfy its capitalization requirements for 2010, 2011, and 2012 and to a funding commitment in subsequent years up to a limit determined by an agreed-upon formula.

57.    Freddie Mac's agreement with Treasury expressly contemplated that the Government Preferred Stock would be redeemed at some future date, the agreement with Treasury would be terminated, and the Company would return to full private financing. According to Freddie Mac's Form 8-K, filed with the SEC on September 11, 2008, "If after termination of [Treasury's] Commitment, Freddie Mac pays down the liquidation preference of each outstanding share of Senior Preferred Stock in full, such shares will be deemed to have been redeemed as of date of such payment..." Following redemption, "the shares of the Senior Preferred Stock shall no longer be deemed to be outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease."

58.    Under the direction of the FHFA, the Company expected to incur substantial loan losses in the years after being placed in conservatorship. Therefore, the Company booked substantial reserves, recorded anticipated, unrealized loan losses, and under applicable accounting standards, eliminated the value of non-cash deferred tax assets from its balance sheet. These impairments required the Company to draw increasing amounts against Treasury's funding commitment.

59.    As of August 17, 2012, prior to the Third Amendment, the total outstanding Liquidation Preference on the Government Preferred Stock was $72.3 billion.

## Freddie Mac Returns to Profitability

60.    In 2012, as the housing market and the broader economy began to recover, Freddie Mac returned to profitability. After three years in conservatorship, it became clear that the Company's financial position was not as bad as had been feared. Freddie

Mac's actual realized losses on its mortgages were far less than the Company had projected, and the assets that the Company had initially written down were worth more than was reflected on the Company's balance sheet.

61.    On March 9, 2012, Freddie Mac reported its first quarterly profit since the imposition of the conservatorship. In its Form 10-K filed with the SEC, the Company reported net income of $619 million for the fourth quarter of 2011. On May 3, 2012, the Company reported net income of $577 million for the first quarter of 2012.

62.    On August 7, 2012, Freddie Mac announced that, for the first time since the imposition of the conservatorship, it had achieved positive net worth. The Company reported net income of $3.0 billion for the second quarter of 2012 and a positive net worth of $1.1 billion (after its quarterly dividend payment to Treasury of $1.8 billion). The Company also announced that as a result of its positive net worth, it would not request a draw from Treasury under the PSPA for the quarter.

63.    In 2012 and 2013, Freddie Mac posted consistently large profits. The Company reported quarterly net income of $5.6 billion for the third quarter of 2012, $4.5 billion for the fourth quarter of 2012, $4.6 billion for the first quarter of 2013, $5.0 billion for the second quarter of 2013, and $30.5 billion for the third quarter of 2013.[10] Since the start of 2012 through the present, Freddie Mac has reported total net income of $54.4 billion.

64.    After having been placed in conservatorship, Freddie Mac had declared massive non-cash losses, due to its write-down of the value of deferred tax assets and its

---

[10] Freddie Mac's extraordinary third quarter of 2013 reflected a $23.9 billion release of the valuation allowance on the Company deferred tax assets, as discussed *infra*. Without this adjustment, the Company's pre-tax income for the third quarter of 2013 was $6.5 billion.

taking of loss reserves. In 2008, Freddie Mac established a valuation allowance against its deferred tax assets and added to that valuation allowance in subsequent quarters. By 2013, however, it had become clear that these non-cash losses were substantially overstated. As a result, the Company, as part of its earnings statement for the third quarter of 2013, released the valuation allowance against its deferred tax assets, resulting in the recognition of a $23.9 billion federal income-tax benefit.

65.    After two years of profitability, Freddie Mac's balance sheet showed that, absent the Net Worth Sweep, the Company would have soon been able to redeem all outstanding Government Preferred Stock pursuant to the terms of the pre-Third Amendment PSPA. This redemption would have enabled the Company to continue as a financially solvent, viable, and valuable entity. Absent the Net Worth Sweep, the Company's rapidly growing profitability and net worth would have provided a roadmap to exiting the conservatorship and returning to fully private ownership and operation.

**Treasury and FHFA Execute the Third Amendment**

66.    On August 17, 2012, the Company's optimistic, favorable outlook abruptly ended with the announcement by the Government that it was unilaterally amending the terms of its agreements with Freddie Mac, effective January 1, 2013. The change was devastating. Instead of taking steps to aid in Freddie Mac's return to profitability and exit from conservatorship, Treasury and the FHFA together entered into the Third Amendment to the PSPA. The Third Amendment ensured that the Government—and not Freddie Mac—would reap the entire benefit of Freddie Mac's newfound profitability. As explained *infra*, Treasury has not only admitted this was the purpose and effect of

the Third Amendment, it expressed pride in its self-serving action.[11] Likewise, according to the FHFA's Inspector General, the goals of the Third Amendment were to benefit taxpayers and wind down the Company.[12]

67.     Under the terms of the Third Amendment, rather than paying Treasury a 10% annual dividend on its Government Preferred Stock, Freddie Mac is now required to pay every dollar of its entire quarterly net worth, above a nominal, temporary capital reserve, to Treasury as a dividend.[13] In a press release announcing the change, Treasury described the new policy as a "Full Income Sweep of All Future … Freddie Mac Earnings to Benefit Taxpayers." In Treasury's own words, the Government would now take "a quarterly sweep of every dollar of profit that [Freddie Mac] earns going forward."[14]

68.     Any increase in the net worth of Freddie Mac flowing from net income or other comprehensive income will automatically be swept to Treasury in its entirety, no matter how large that increase in net worth is or how much it exceeds the 10% dividend that Freddie Mac was obligated to pay pursuant to the pre-Third Amendment PSPA. Furthermore, the Company must pay this new net-worth dividend to Treasury in cash,

---

[11] See Press Release, Treasury, *Treasury Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie Mac* (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx.

[12] See FHFA Office of Inspector General, *Analysis of the 2012 Amendments to the Government Stock Purchase Agreements*, at 18-19 (Mar. 20, 2013).

[13] The capital reserve amount starts at $3 billion and steadily decreases by $600 million each year until it is eliminated on January 1, 2018. Under the Net Worth Sweep, the Company's net worth is defined as the amount by which its total assets (excluding Treasury's funding commitment and any unfunded amounts related to the commitment) exceed its total liabilities (excluding any obligation in respect of capital stock), as reflected on the Company's balance sheet with generally accepted accounting principles.

[14] Press Release, Treasury, Treasury Department Announces Further Steps To Expedite Wind Down of Fannie Mae And Freddie Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx; *see also Statement of FHFA Acting Director Edward J. DeMarco On Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements* (Aug. 17, 2012), *available at* http://www.fhfa.gov/webfiles/24203/final_fhfa_pspa_8172012.pdf ("Replacing the current fixed dividend in the PSPAs with a variable dividend based on net worth will … fully capture financial benefits for taxpayers").

even though the net worth of the Company may include non-cash assets, e.g., the deferred tax assets. As a result, Freddie Mac has had to sell non-liquid assets or issue additional debt to pay the net-worth dividend. This requirement has prevented the Company from maximizing the value of its assets.

69.     According to the FHFA, the Net Worth Sweep makes it "impossible for [Freddie Mac] to build up any capital because [its] net worth[], except for the temporary buffer amount, will be zero after [it] make[s] each quarterly dividend payment to Treasury."[15] The Net Worth Sweep will also permanently prevent the Company from redeeming the Government Preferred Stock, investing in its business, or retaining any profits. And since the Net Worth Sweep, under Treasury's new rules, applies to all new net worth *in perpetuity*, Freddie Mac will *never* be able to do any of these things. Essentially, Treasury and the FHFA have forever converted Freddie Mac's entire net worth into an unlimited Government slush fund. So long as Freddie Mac remains in operation, it must transfer all of its net worth to Treasury, but the outstanding Liquidation Preference will always remain at $72.3 billion. Under the Net Worth Sweep, not a single dollar of Freddie Mac's value can be used for anything except to pay the Government, and even those payments cannot be counted against the Government's outstanding Liquidation Preference.

70.     The Government's purpose in imposing the Net Worth Sweep was remarkably transparent. Treasury unabashedly stated that one of the objectives for the Net Worth Sweep was "[m]aking sure that every dollar of earnings that ... Freddie Mac

---

[15] FHFA Office of Inspector General, *Analysis of the 2012 Amendments to the Government Stock Purchase Agreements*, at 15 (Mar. 20, 2013).

generates[s] will be used to benefit taxpayers for their investment in those firms."[16]
Likewise, the FHFA acknowledged at the time that the Net Worth Sweep was designed
to "fully capture financial benefits for taxpayers."[17] In other words, the purpose was not
to put the Company on sound financial footing or conserve its assets—but rather to
expropriate all of the Company's assets solely to benefit taxpayers.

71.     Treasury and the FHFA also offered another justification for the Net
Worth Sweep: to wind down Freddie Mac as a private company. Treasury explained that
the Net Worth Sweep was designed to fulfill "the commitment made in the
Administration's 2011 White Paper that the GSEs will be wound down and will not be
allowed to retain profits, rebuild capital, and return to the market in their prior form."
In another press release, Treasury noted that the Net Worth Sweep would "help expedite
the wind down of ... Freddie Mac" and "support the continued flow of mortgage credit
during a responsible transition to a reformed Housing market." Similarly, an FHFA
report acknowledged that the "[w]ind down of [Freddie Mac]" was an overarching goal
of the Third Amendment.[18]

72.     As *Fortune Magazine's* Term Sheet blog explained:[19]

Why did the Treasury enact the so-called Third Amendment that so
radically altered the preferred-stock agreement? By mid-2012, Fannie and

---

[16] Press Release, Treasury, Treasury Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx.

[17] *Statement of FHFA Acting Director Edward J. DeMarco On Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements* (Aug. 17, 2012), *available at* http://www.fhfa.gov/webfiles/ 24203/final_fhfa_pspa_8172012.pdf.

[18] FHFA Office of Inspector General, *Analysis of the 2012 Amendments to the Government Stock Purchase Agreements*, at 18-19 (Mar. 20, 2013)

[19] Shawn Tully, *What's Behind Perry Capital's Fannie and Freddie Gambit,* CNN MONEY: A SERVICE OF CNN, FORTUNE, AND MONEY, Jul. 8, 2013, *available at* http://finance.fortune.cnn.com/2013/07/08/ whats-behind-perry-capitals-fannie-freddie-gambit/.

Freddie were beginning to generate what would become gigantic earnings
as the housing market rebounded. If the original agreement remained in
place, the GSEs would build far more than $100 billion in retained
earnings, and hence fresh capital, in 2013 alone. That would exert pressure
for Congress to allow Fannie and Freddie to pay back the government in
full, and reemerge as private players. [Treasury Secretary] Timothy
Geithner was strongly opposed to the rebirth of the old Fannie and
Freddie. The "sweep clause" that grabbed the entire windfall in profits was
specifically designed to ensure that Fannie and Freddie remained wards of
the state that would eventually be liquidated.

73. The purposes of the Third Amendment—to enrich the Government and

prepare to wind down Freddie Mac as a private company—are directly at odds with the

statutory duties and powers of the FHFA when it acts as Conservator to the Company.

Under HERA, the FHFA's powers as Conservator are limited to only those "necessary to

put the [Company] in a sound and solvent condition" and those that "preserve and

conserve the assets and property of the [Company]." 12 U.S.C. § 4617(b)(2)(D).

Furthermore, the FHFA, acting in its capacity as Conservator to Freddie Mac, may

"perform all functions of the [Company] in the name of the [Company]" only to the

extent they are "consistent with [its] appointment as conservator." 12 U.S.C. § 4617(b)

(2)(B)(iii).

74. The Third Amendment, however, was not necessary to put the company in

a "sound and solvent condition" or "preserve and conserve the assets and property" of

the Company. At the time the Government imposed the Third Amendment, Freddie Mac

had already returned to profitability and was on track to remain profitable for the

foreseeable future. Instead of preserving and conserving the Company's property, the

Third Amendment squandered that property by allowing Treasury to expropriate it.

75. By agreeing to the Third Amendment, the FHFA took actions that fell

outside the scope of its statutory authority when acting as Conservator to Freddie Mac.

Therefore, when Freddie Mac signed the Third Amendment, it was not—and could not have been—acting in its capacity as Conservator to Freddie Mac. Instead, the FHFA was acting as a Government agent when it signed the Third Amendment.

76.     The dividends that the Company has paid to Treasury pursuant to the Third Amendment have and will continue to be enormous. In 2012, Freddie Mac earned profits of approximately $13.7 billion, and in the first three quarters of 2013, the Company earned profits of approximately $40.1 billion. This includes $23.9 billion in recaptured tax assets the Company had written off in prior years. Since the imposition of the Net Worth Sweep, Freddie Mac will have paid the Government an additional $40.4 billion over and above what the Company was obligated to pay in dividends under the pre-Third Amendment PSPA. And according to the FHFA, "[O]ver the long run, the [Third Amendment] could result in larger net payments to Treasury."[20]

77.     These payments from Freddie Mac to Treasury were not only enormous; they were also expected. According to the FHFA's Inspector General, the FHFA knew that the Net Worth Sweep could result in "an extraordinary payment to Treasury"[21] These payments are so large that they even affected the debt-ceiling crisis in 2013. According to a report published by *Politico*, "A Treasury Department official confirmed that the funds returned by [Freddie Mac] will be deposited into the general fund and will be factored into how long the department can continue to pay the government's bills before running up against the debt ceiling."[22] *Politico* further explained that according

---

[20] FHFA Office of Inspector General, *Analysis of the 2012 Amendments to the Government Stock Purchase Agreements*, at 15 (Mar. 20, 2013).

[21] *Id.*

[22] Jon Prior, Freddie Mac's *Big Payoff: $59B Sent to Feds*, POLITICO, May 9, 2013, *available at* http://www.politico.com/story/2013/05/fannie-mae-to-send-treasury-big-payday-91128.html.

to the Bipartisan Policy Center, Freddie Mac's dividend payments, together with Fannie Mae's payments, "would likely push back the date when the government will breach the debt ceiling until October, if it is not raised before then."[23]

78.    Pursuant to the Third Amendment, the Government will likely recoup every dollar of the $72.3 billion it infused into Freddie Mac, with interest, in early 2014. And over the next decade, the Government will collect tens of billions of additional dollars in profits from Freddie Mac.

### The Net Worth Sweep Is an Unlawful Taking of Freddie Mac's Private Property Without Just Compensation

79.    Before the imposition of the conservatorship, Freddie Mac operated as a private company, which secured capital from private investors and was traded on a public stock exchange.

80.    Under HERA, the FHFA's limited role as Conservator was to operate Freddie Mac so as to render it "sound and solvent" and to "conserve [its] assets and property" with the goal of returning the Company to financial health. But instead of attempting to rehabilitate Freddie Mac in good faith, the FHFA exceeded its statutory authority as Conservator and, together with Treasury, raided the Company's assets for use by the Government.

81.    By unilaterally imposing the Third Amendment, the Government required Freddie Mac to provide the United States with "every dollar of earnings" from the Company in perpetuity. The Third Amendment *ipso facto* entirely deprives Freddie Mac of all of its reasonable value for as long as the Company remains in business.

---

[23] *Id.*

82.    The Government's Net Worth Sweep is indistinguishable from simply "taking" the Company outright. By taking "every dollar of earnings" of Freddie Mac in perpetuity, the Government effectively nationalized the Company. Were the Government to simply nationalize a private company for public use in order to extract its profits to fill Government coffers, the Fifth Amendment would mandate the payment of "just compensation." Likewise, when the effect of Government action is the total deprivation of all reasonable economic value of the property, a taking also exists, and the Government must pay "just compensation."

83.    As a direct result of the Government's imposition of the Third Amendment, Freddie Mac has no economic value. By the Third Amendment's express terms, Freddie Mac cannot have any net worth. It cannot accumulate any capital, invest in its business, or retain profits. And since the Net Worth Sweep applies now and forever, Freddie Mac's predicament is permanent; it will *never* have any economic value.

84.    Additionally, by executing the Net Worth Sweep, the Government's actions had the effect of permanently depriving the Company of all economic value, defeated the reasonable, investment-backed expectations of the Company under the original PSPA, and unilaterally abrogated the Company's rights under the original PSPA.

85.    The Government took all of Freddie Mac's economic value, not to make the Company "sound and solvent" or "conserve [its] assets and property," but rather for the public use of the Government. As the FHFA and Treasury have admitted on numerous occasions, they plan to unwind the Company and maximize its return not for the Company but for the Government. The Government has taken—and continues to

take— all of the Company's massive revenues for that purpose. By December 31, 2013,

Freddie Mac will have paid $71.3 billion in dividends to the Government, and it is on

track to transfer tens, if not hundreds, of billions more. As Guggenheim Partners analyst

Jaret Seiberg wrote in a note to clients, "Washington could quickly get addicted to the

revenue from Fannie and Freddie."[24]

86.     While the Government has collected over seventy billion dollars in

dividend payments from Freddie Mac—and is on track to collect billions more—the

Government has never provided the Company with just compensation for the total loss

of the Company's economic value. Indeed, the Government has not provided the

Company with any compensation at all. Therefore, the Government's Net Worth Sweep

constitutes an unlawful taking without just compensation in violation of the Fifth

Amendment to the U.S. Constitution.

### DERIVATIVE AND DEMAND ALLEGATIONS

### Plaintiffs' Demand on Freddie Mac Was Wrongfully Refused

87.     Plaintiffs incorporate by reference and reallege each and every allegation

of the preceding paragraphs, as though fully set forth herein.

88.     On October 18, 2013, pursuant with Va. Code Ann. § 13.1–672. 1.B,

Plaintiffs demanded that Freddie Mac immediately commence legal action against the

Government to recover all losses sustained by the Company as a result of the Third

Amendment ("Plaintiffs' Demand"). *See* Ex. A. Plaintiffs made this written demand on

both the FHFA and the Company's officers and directors, and in accordance with the

---

[24] Jon Prior, Freddie Mac's *Big Payoff: $59B Sent to Feds*, POLITICO, May 9, 2013, *available at* http://www.politico.com/story/2013/05/fannie-mae-to-send-treasury-big-payday-91128.html.

Virginia Stock Corporation Act, it placed Freddie Mac on notice by (1) specifically identifying the alleged wrongs and (2) demanding action by the Company and its officers, including the FHFA in its capacity as Conservator, to redress these wrongs.

89.     Pursuant to Va. Code Ann. § 13.1–672. 1.B, the Company had ninety days to respond to Plaintiffs' Demand. However, neither the Company's Board of Directors nor its Chief Executive Officer ("CEO"), Donald H. Layton, responded to Plaintiffs' Demand within the ninety-day period. As of this filing, the Company's Board and CEO have failed to respond to Plaintiffs' Demand.

90.     On January 15, 2014, the FHFA responded to Plaintiffs' Demand purportedly in its capacity as Conservator of Freddie Mac ("FHFA's Response"). *See* Ex. B. The FHFA's Response stated, "Please be advised that the Conservator does not intend to authorize Freddie Mac or its directors or officers on behalf of Freddie Mac to take the actions that Shareholders demand." The FHFA's Response did not provide any reasons for this decision and did not indicate that the FHFA, Freddie Mac, or the Company's officers and directors had conducted any investigation of Plaintiffs' claims.

91.     In failing to respond to Plaintiffs' Demand or conduct any investigation into Plaintiffs' claims, Freddie Mac failed to properly exercise any business judgment or due care. Furthermore, the FHFA, in outright refusing Plaintiffs' Demand without any indication that it investigated the Demand, failed to objectively and disinterestedly exercise its business judgment and due care. Freddie Mac and the FHFA's refusal to investigate or litigate claims that the Company's assets were unlawfully taken in violation of U.S. Constitution was in bad faith and unreasonable. As a result, Plaintiffs' Demand was wrongfully refused.

**The FHFA Unreasonably Prevented Freddie Mac's Board
from Investigating and Litigating Plaintiffs' Claims in Good Faith**

92.     On January 15, 2014, the FHFA notified Plaintiffs that "the Conservator

does not intend to authorize Freddie Mac or its directors or officers on behalf of Freddie

Mac to take the actions that Shareholders demand." *See* Ex. B.

93.     The FHFA's refusal to allow the Company or its Board of Directors to

independently investigate or litigate constitutional claims against the Government

prevented the Company from potentially recouping tens of billions of dollars that the

FHFA, in conspiracy with Treasury, took from the Company. This refusal to allow the

Company to independently investigate and litigate these claims is both unreasonable

and in direct conflict with the good-faith business interests of the Company.

94.     As reported in the Company's public filings, on September 6, 2008, at the

request of the Secretary of the Treasury, the Chairman of the Board of Governors of the

Federal Reserve, and the Director of FHFA, Freddie Mac's Board adopted a resolution

consenting to the Company's placement into conservatorship. The Director of FHFA

then appointed the FHFA as Freddie Mac's Conservator on September 6, 2008, in

accordance with the Regulatory Reform Act and the Safety and Soundness Act.

95.     As confirmed by the Company's public filings, upon the FHFA's

appointment, it "immediately succeeded to all rights, titles, powers and privileges of

Freddie Mac, and of any … director of Freddie Mac with respect to Freddie Mac and its

assets, and succeeded to the title to all books, records and assets held by any other legal

custodian or third party [of Freddie Mac]. The conservator has the power to take over

[Freddie Mac's] assets and to operate [Freddie Mac's] business … and to conduct all

business of the company." The FHFA has overall management authority over Freddie Mac's business when it acts in accordance with its statutory authority as Conservator.

96.    In announcing the appointment of FHFA as Conservator of Freddie Mac, Director Lockhart stated on September 7, 2008 that "FHFA will assume the power of the Board and management." Freddie Mac's SEC filings confirm that the Board has no independent power separate from the FHFA. According to Freddie Mac's 2012 10-K statement, "The directors serve on behalf of, and exercise authority as directed by, the Conservator." The 2012 10-K further acknowledges that Freddie Mac must "consult[] with and obtain[] approval of the Conservator before taking action" in specific areas, including, *inter alia*: matters involving the PSPA with Treasury; matters that relate to the Conservator's powers, the legal effect of the Conservatorship, and initiation of litigation addressing the actions or authority of the Conservator; and agreements relating to litigation in excess of $50 million.

97.    Accordingly, Freddie Mac's Board no longer has the power or duty to manage, direct, or oversee the business and affairs of the Company without the express consent of the FHFA in its capacity as Conservator. Therefore, in order for the the Board to bring suit for the taking of the Company's property by the Government, it must have the express authorization of the FHFA.

98.    By refusing to provide authorization to Freddie Mac's Board, the FHFA prevented the Board from conducting any investigation of serious allegations involving the unconstitutional taking of the Company's entire net worth. The FHFA, through its unreasonable denial of authorization to Freddie Mac's Board, benefitted itself by preventing the Company from investigating or litigating the FHFA's own wrongful

conduct: the FHFA's conspiracy with Treasury to take the entire net worth of the

Company without just compensation. Therefore, the FHFA's actions were in bad faith.

### The FHFA Wrongfully Refused Plaintiffs' Demand by Failing to Reasonably Investigate and Litigate Plaintiffs' Claims in Good Faith

99.     On January 15, 2014, the FHFA refused Plaintiffs' Demand by failing to

sue the Government for the unconstitutional taking of Freddie Mac's entire net worth.

*See* Ex. B. In its letter, the FHFA provided no indication whatsoever that it had

conducted any investigation into Plaintiffs' claims, and it flatly refused to pursue legal

action, despite the strength of the underlying allegations, without providing any reasons

or basis for failing to do so. *Id.*

100.    Plaintiffs' Demand raised serious constitutional claims involving the

unlawful taking of Freddie Mac's entire net worth in violation of the Fifth Amendment

to the U.S. Constitution, amounting to potential damages totaling in the tens of billions

of dollars. *See* Ex. A. The FHFA's refusal to even independently investigate Plaintiffs'

constitutional claims demonstrates that the FHFA failed to exercise *any* business

judgment or due care, let alone the proper business judgment commensurate with its

statutory duties as Conservator. The FHFA's refusal to investigate Plaintiffs' claims in

the face of extensive evidence of Government wrongdoing, as described *supra*, is

unreasonable.

101.    Furthermore, the FHFA's failure to investigate Plaintiffs' claims directly

conflicts with its statutory duties under HERA as Conservator to Freddie Mac. The

FHFA has a statutory duty as Conservator to operate the Company so as to render it

"sound and solvent" and to "preserve and conserve [its] assets and property." However,

Plaintiffs have alleged that the Government, through the Third Amendment, has instead raided Freddie Mac's assets and property for the Government's use and placed the Company in a less sound financial position. Faced directly with these serious allegations, Freddie Mac's flat refusal to investigate claims that, if successful, would result in a return of tens of billions of dollars of the Company's assets, constitutes a breach of its statutory duties as Conservator. And by breaching its statutory duties, the FHFA unreasonably refused Plaintiffs' Demand.

102.   The FHFA's refusal to investigate and litigate Plaintiffs' claims was also in bad faith. The FHFA has manifest, disabling, and irreconcilable conflicts of interest in this matter that prevent it from objectively and disinterestedly exercising proper business judgment on behalf of the Company.

103.   As a party to the Third Amendment, the FHFA's conduct is at the heart of this action, which challenges the very unconstitutional actions in which the FHFA participated. As an agency of the federal government, the FHFA is interested in and benefits from the Third Amendment and its actions in refusing to investigate the matter is a thinly-veiled attempt to conceal its own unlawful conduct.

104.   Moreover, any takings action initiated by the FHFA against the United States would necessarily implicate not only the FHFA but also Treasury. Yet, as explained *infra*, Treasury exercises *de facto* control over the actions of the FHFA, thereby disabling the FHFA from independently assessing whether such an action would benefit the Company.

105.   Treasury is a closely-related sister federal agency that has acted in concert with the FHFA throughout the conservatorship. Together, the FHFA and Treasury

placed Freddie Mac in conservatorship; established the Preferred Stock Purchase Agreement between Treasury and Freddie Mac and then amended the PSPA three times, including the Third Amendment at issue in this Action; established a new secured lending credit facility available to Freddie Mac; and initiated a new program to purchase the mortgage-backed securities of Freddie Mac. The Secretary of the Treasury also occupies one of the four reserved seats on the Federal Housing Finance Oversight Board ("FHFOB"), which is statutorily required to "advise the Director [of FHFA] with respect to overall strategies and policies in carrying out the duties of the Director under [HERA]." 12 U.S.C. § 4513a. The Secretary of the Treasury may also "require a special meeting of the [FHFOB]." *Id.*

106.    Throughout the conservatorship, the FHFA operated as a revolving door for former Treasury officials, further demonstrating the close-knit relationship between these two federal-government agencies. Former FHFA Acting Director DeMarco, who served in that position from 2009 to 2014 and acceded to Treasury's proposed Third Amendment, previously worked for ten years at Treasury. DeMarco was Director of the Office of Financial Institutions Policy at Treasury, which "oversaw analyses of public policy issues involving [Freddie Mac] and other financial institutions."[25]

107.    These incestuous ties between the FHFA and Treasury permeate the key positions and offices that were responsible for the Third Amendment. Jeffrey Spohn ("Spohn"), who led FHFA's Office of Conservatorship Operations from the imposition of the conservatorship in 2008 to 2013, previously worked for more than twenty-five years at Treasury. Spohn worked at the Office of the Comptroller of the Currency at Treasury,

---

[25] *Meet the Acting Director*, FHFA, http://www.fhfa.gov/Default.aspx?Page=67 (last visited Feb. 20, 2013.

serving as National Bank Examiner.[26] Stephen Cross, who was FHFA's Deputy Director

of the Division of Federal Home Loan Bank Regulation from 2002 to 2013, previously

worked for nearly fifteen years at Treasury. His successor, Fred C. Graham, also

previously worked for Treasury.

108.   Prior to the FHFA's refusal to investigate or litigate Plaintiffs' claims,

newly confirmed FHFA Director Mel Watt also named three Treasury officials as Special

Advisors to the FHFA. Megan Moore, who has worked for Treasury since 2009, most

recently as Deputy Assistant Secretary for Housing, Small Business, and TARP, was

named Special Advisor, Intergovernmental to the FHFA. Eric Stein, who worked for

Treasury from 2009 to 2010, was named Special Advisor and Acting Chief of Staff to the

FHFA. Mario Ugoletti, who worked for Treasury for fourteen years, was named Special

Advisor, Agency to the FHFA. These Treasury officials held key positions of leadership

in the FHFA when Plaintiffs' Demand to investigate and litigate claims regarding

unconstitutional actions by both the FHFA and Treasury was pending.[27]

109.   The FHFA and Treasury's actions comprise the heart of this action. The

Net Worth Sweep was instituted through an agreement between the FHFA and Treasury

(the Third Amendment), and both the FHFA and Treasury directly reap the benefits of

this incestuous relationship to the detriment of the Company. The FHFA and Treasury

did not act independently in agreeing to the Third Amendment. Instead, the FHFA's

actions were motivated by its conflicted relationship with Treasury. It was Treasury, not

---

[26] See FHFA Announces Senior Staff Changes; DeLeo Named Deputy Director Division of Conservatorship, FHFA, Dec. 11, 2013, available at http://www.fhfa.gov/webfiles/25873/FHFAOfficesFinal.pdf.

[27] See Federal Housing Finance Agency Director Mel Watt Announces Four Staff Appointments, FHFA, Jan. 10. 2014, available at http://www.fhfa.gov/webfiles/25943/FHFAStaffApptsPR011014Final.pdf.

the FHFA, that initially proposed the Third Amendment, and it was Treasury that benefitted from the FHFA's refusal to investigate Plaintiffs' claims.[28]

110.    The close and disabling ties between the FHFA and Treasury prevented the FHFA from objectively and disinterestedly exercising proper business judgment on behalf of the Company. In fact, without the close and disabling ties between the FHFA and Treasury, the unlawful conduct complained of herein would have never occurred in the first instance.

111.    As a direct result of the FHFA's conflicts of interest throughout its conservatorship of Freddie Mac, the FHFA has functioned as a Government regulator, not as a conservator to the Company. Despite its statutory mandate to operate Freddie Mac so as to render it "sound and solvent" and to "conserve [its] assets and property," the FHFA entered into a self-dealing pact with Treasury to provide the Government with "every dollar of earnings" from the Company in perpetuity.

112.    In signing the Third Amendment, the FHFA was not managing Freddie Mac for the benefit of the Company but rather for the benefit of the Government. On March 4, 2013, FHFA Acting Director DeMarco delivered remarks to the National Association for Business Economics's annual policy conference, entitled "FHFA's Conservatorship Principles for 2013." DeMarco explained, "FHFA has reported on numerous occasions that, with taxpayers providing capital supporting [Freddie Mac's] operations, this 'preserve and conserve' mandate directs FHFA to minimize losses on

---

[28] *See In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*, No. 13-mc-1288-RCL, Doc. No. 6-1, at T3901 (*Treasury's Capital Support for The GSEs: Summary Review and Key Considerations* (PowerPoint) (Aug. 8, 2012)) (discussing the Net Worth Sweep as Treasury's "proposed solution" to the Companies' dividend requirements).

behalf of taxpayers."[29] Instead of "preserving and conserving" the assets of Freddie Mac for the Company, as mandated by statute, DeMarco unmasked the FHFA's—and Treasury's—real directive: to "preserve and conserve" the private assets of Freddie Mac for public use by the Government.

113.    When faced with substantive allegations that its own actions, taken at the behest of Treasury, violated the Fifth Amendment to the U.S. Constitution, the FHFA did not even attempt to independently investigate those actions. The agency instead acted to cover up its own and Treasury's wrongdoing by refusing Plaintiffs' Demand without any factual or legal basis to do so.

114.    Together, the FHFA's conduct shows that to the extent that it exercised any business judgment at all, that business judgment was neither objective nor disinterested. The FHFA's failure to investigate and litigate Plaintiffs' claims was unreasonable and in bad faith. As a result, Plaintiffs' Demand was wrongfully refused.

## CLAIMS FOR RELIEF

### Unlawful Taking Without Just Compensation
### Under the Fifth Amendment to U.S. Constitution

115.    Plaintiffs incorporate by reference and reallege each and every allegation of the preceding paragraphs, as though fully set forth herein.

116.    The Fifth Amendment to the United States Constitution provides that no person shall "be deprived of life liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

---

[29] Edward J. DeMarco, Acting Director, FHFA, Remarks as Prepared for Delivery, Zillow and the Bipartisan Policy Center: Getting Our House In Order, Washington, D.C. (Oct. 24, 2013), *available at* http://www.fhfa.gov/webfiles/25634/zillowspeechfinal102413.pdf.

117.   By imposing the Third Amendment, which in Treasury's own words was designed to take "every dollar of earnings [Freddie Mac] generates ... to benefit taxpayers," the Government took all reasonable value of the Company for public use.

118.   When the Government takes private property for a public use or a public purpose, the Fifth Amendment requires the payment of "just compensation."

119.   The Government did not pay—and under the Third Amendment will not pay—just compensation to Freddie Mac for its taking of the entire net worth of the Company. As a result, Freddie Mac has been injured and is entitled to just compensation in a sum equal to the amounts taken by the Government through its unconstitutional imposition of the Third Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of Freddie Mac, demand judgment against the United States of America as follows:

A. Finding that the United States has unlawfully taken the private property of Freddie Mac for public use without just compensation in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution;

B. Determining and awarding Freddie Mac just compensation for the Government's taking of its property;

C. Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees, experts' fees, costs, and other expenses; and

D. Granting such other and further relief as the Court deems just and proper.

DATED: February 25, 2014

**SCHUBERT JONCKHEER & KOLBE LLP**


BY:      /s/ Robert C. Schubert
         ROBERT C. SCHUBERT

Robert C. Schubert
Attorney of Record
*rschubert@schubertlawfirm.com*

Three Embarcadero Ctr Ste 1650
San Francisco, CA 94111-4018
Ph: 415-788-4220
Fx: 415-788-0161


OF COUNSEL:                    **SCHUBERT JONCKHEER & KOLBE LLP**

Noah M. Schubert
*nschubert@schubertlawfirm.com*

Miranda P. Kolbe
*mkolbe@schubertlawfirm.com*

Three Embarcadero Ctr Ste 1650
San Francisco, CA 94111-4018
Ph: 415-788-4220
Fx: 415-788-0161


**SHAPIRO HABER & URMY LLP**

Edward F. Haber
*ehaber@shulaw.com*

53 State Street
Boston, MA 02109
Ph: 617-439-3939
Fx: 617-439-0134

*Attorneys for Plaintiffs*

## VERIFICATION

I, **Bruce Reid**, hereby verify and declare under penalty of perjury that I have reviewed the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel. I have personal knowledge of the facts stated in paragraph 23 of the Complaint, which are true and correct.

DATED: 2/25/2014

_____
BRUCE REID

I, **Bryndon Fisher**, hereby verify and declare under penalty of perjury that I have reviewed the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel. I have personal knowledge of the facts stated in paragraph 24 of the Complaint, which are true and correct.

DATED: 1/25/2014

_____
BRYNDON FISHER